**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

_____
                                                         )
**PRIORITY AUTO GROUP, INC.,**           )
                                                         )
           **Plaintiff,**                            )
                                                         )
**v.**                                                   )   **Civil Action No.: 2:12-cv-00492-RBS-LRL**
                                                         )
**FORD MOTOR COMPANY**                     )
                                                         )
           **Defendant.**                          )
                                                         )
_____)

**PLAINTIFF PRIORITY AUTO GROUP, INC.'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Priority Auto Group, Inc., ("Priority") opposes Defendant Ford Motor Company's ("Ford") Motion for Summary Judgment and accompanying Memorandum in Support (Dkt. #29-30), and submits this Opposition and accompanying Statement of Material Facts in Dispute, which is incorporated by reference herein as if fully restated, in support thereof:

## INTRODUCTION

In this matter, Ford improperly used a right of first refusal (sometimes "ROFR") as an excuse to shut down Kimnach Ford ("Kimnach"). To carry out that wrongdoing, Ford failed to even consider Priority as an applicant, which it could not do under Virginia law. Ford's purported exercise of the ROFR was invalid since it never intended to step into the shoes of Priority and perform the agreement as Priority was required to do. Yet, Ford now wants to use the perversion of the ROFR process, and the illegal shortcutting of its internal application process, to claim that Plaintiff has no standing to bring this action. Ford's behavior should not be countenanced.

As Plaintiff will show, there are issues of material fact that must be decided by a jury in this case.  Priority's case is straightforward. It negotiated a contract for purchase of Kimnach on terms beneficial to it and to Kimnach and its owner, Julian Council ("Council"). Priority, a successful owner and operator of a group of dealerships, including a Chevrolet dealership close to Kimnach,[1] foresaw the ability to earn substantial profits and create substantial value by operation of the dealership. Council saw the transaction as an opportunity to maintain a position in a dealership his family had started decades before to be operated by an established and successful group.  (See Cummings Deposition, Exhibit K, page 42: 20-25; Council Deposition, Exhibit C, page 177: 7-14; Ellmer Deposition, Exhibit I, page 12: 18-25; 13: 1-21).

Ford had a different interest, however. It wanted to shut Kimnach down. It never intended to allow a transfer of or the continued operation of the dealership. Once the buy/sell agreement was sent to Ford as part of Priority's application for approval, an internal email made clear Ford's intent:

> We are in the midst of gathering all of the Ford Motor Company approvals along with securing the written commitment of the surrounding dealers (Beach Ford, Freedom Ford and Cavalier Ford) to exercise our Right of First Refusal, per the Sales and Service Agreement, **to step in to prevent** the buy/sell of Kimnach ford and immediately assign our rights (and liabilities) to the three remaining Ford dealers in the market to complete the buy-sell and then **close the dealership**."

(See Email from Stephanie Miello, Franchise Coordinator SE for Ford to Steve Kinkade of Ford on October 15, 2010, (KIM2 2256-2257), Exhibit B). (emphasis added)

---

[1] See Ellmer Deposition, Exhibit I, page 9: 8-18

Recognizing that it could not reject Priority under Virginia law because it is a successful and well-regarded owner and operator of motor vehicle dealerships[2], Ford decided its only alternative to meet its goal was to misuse the ROFR process and to assign the ROFR rights to a company formed to take assignment made up of three local Ford competitors, Dealer Acquisition Company, LLC ("DAC").[3] Ford intended to financially support[4] and use DAC to renegotiate the agreement Priority had created with Mr. Council to close the dealership down with much less advantageous terms than those negotiated by Priority[5].  Ford even threatened Priority that if it did not go along with this invalid exercise of the right of first refusal that it would make sure that it never got a franchise[6].

Ford's actions violated Virginia law.  Priority could not be turned down under Virginia law absent a valid exercise by Ford of the ROFR.  Ford's performance through DAC was not a valid exercise of the ROFR.  And because it did not properly use the ROFR process, Ford violated Virginia Code §46.2-1569(3a), and it tortiously interfered with Priority's contract and business opportunity.

---

[2] See Lisa O'Connor Vigneault Deposition, Exhibit L, pages 174:22; 175: 1-22; 176: 1-22; 177: 1-22; 178: 1-12; 182: 15-22; 183: 1-19; 191: 6-13; 194: 20-22; 195: 1-2; 223: 9-22; 224; 1-6, 12-22.

[3] See Lisa O'Connor Vigneault Deposition, Exhibit L, pages 200: 5-22; 201: 1-12.

[4] See Lisa O'Connor Vigneault Deposition, Exhibit L, pages 98: 4-22; 99: 1-7; 111: 18-22; 112; 1-5; 116: 7-22; 117: 1-10; 164: 10-22; 165: 1-18; 166: 17-19; 187: 20-22; 188: 1-16; 190: 19-22; 197: 22; 198: 1-15; 211: 6-17; 268: 15-22; 269: 1-22; 270: 17-22; 271: 1-7; 272: 21-22; 273: 1-6; 279: 10-22; 280: 1-21.

[5] See Lisa O'Connor Vigneault Deposition, Exhibit L, pages 213: 7-22; 214: 1-12.  See also Ellmer Deposition, Exhibit I, pages 60: 1-25; 61: 1-14.

[6] See Lisa O'Connor Vigneault Deposition, Exhibit L, pages 206: 5-22; 207: 1-22; 208: 1-9.  See also Ellmer Deposition, Exhibit I, pages 21: 12-25; 22: 1-2; 35: 4-24.

As the remainder of this opposition will show, there are material issues of fact to be determined by the jury in this matter, and when those facts are determined, Priority submits that the jury will find that Priority should prevail. Ford's motion for summary judgment should be denied.

## **BACKGROUND**

In the Statement of Material Facts in Dispute ("SOFD"), attached as Exhibit A, Priority sets forth in detail the material facts in dispute in this matter. For purposes of this Opposition, Priority presents this background.

Kimnach was a motor vehicle dealer franchised by Defendant Ford for about 55 years. (See Council's Deposition, Exhibit C, page 178: 20-23).  On September 14, 2010, Priority as buyer and Kimnach and its President Council as seller entered into an asset and real estate purchase agreement whereby Priority agreed to purchase the operating assets of the business of Kimnach and the real estate on which the business operated ("Kimnach-Priority APA," Exhibit G). The agreement provided rights to Council for which he specifically bargained to continue the operation of the Ford dealership with Council having an equity interest and guaranteed employment while protecting the jobs of Kimnach's other employees. (See Cummings Deposition, Exhibit K, pages 23: 17-25; 24: 1-10; 42: 6-25).

The Kimnach-Priority APA was conditioned on approval by Ford of Priority as a franchisee pursuant to Virginia law.[7]  As a result, Kimnach submitted the Kimnach-Priority APA to Ford with a request that it provide a dealer application to Priority, and Ford received that on September 16, 2010. (See Submission Letter, Exhibit M). Thirty-three (33) days later, Ford notified Kimnach that it was exercising its right of first refusal to perform the Kimnach-Priority

---

[7] See Cummings Deposition, Exhibit K, page 33: 4-10.

APA. At the same time, it sent a letter to Priority notifying it that its application to become a Ford dealer was rejected solely because Ford was exercising its right of first refusal. (See Rejection Letter, Exhibit O).

Ford, however, never intended to perform and close under the Kimnach-Priority APA. (See SOFD, Exhibit A, ¶¶ 37, 38, 39.  See also Exhibits B, U, and X).  In fact, Ford intended to eliminate the Kimnach-Priority APA and to renegotiate a cheaper deal to its benefit. Ford wanted the dealer point closed and never had the intent to honor the Kimnach-Priority APA.  (See SOFD, Exhibit A, ¶¶ 37, 38, 39).  To do this, Ford operated through its assignee, DAC. (See SOFD, Exhibit A, ¶¶ 40, 41).   Once Ford had Priority out of the picture, Ford through its assignee presented an inferior offer to Kimnach and Council that they rejected[8], substituting a much lower monetary offer in lieu of Council's rights to continued ownership in a car dealership and in lieu of providing the continued employment in the car business or opportunity for the upside of an equity interest in a successful car dealership.  (See SOFD, Exhibit A, ¶41.  See also Exhibit Z).  Thereafter, Kimnach and Council on one side, and Ford and its assignee DAC on the other, commenced negotiations but those negotiations, in substantial part, were an attempt to settle disputes between Kimnach and Council on one side and Ford and DAC on the other.  (See SOFD, Exhibit A, ¶¶ 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53.  See also Exhibits U, Z, AA, CC, DD, EE, FF, GG).   To ensure that the point closed, Ford committed ultimately $2,835,500.00 toward the point closure.[9]   Because of Ford's wrongful activities through its assignee, Council had a cause of action pursuant to Virginia Code (similar to that Priority is

[8] Kimnach-DAC APA #1, dated October 19, 2010 and signed by DAC, Exhibit Y.

[9] See April 19, 2011 Email from Bradley Jones to Keith Bins, (KIM2 2543M- 2546), Exhibit MM.  See May 20, 2011 Signed Amended Letter of Understanding, (KIM100005-00015), specifically (KIM100008), Exhibit OO.  See also Lisa O'Connor Vigneault Deposition, Exhibit L, Page 153: 1-6).

seeking to enforce through this legal action). The parties apparently came to a settlement of their competing claims, the "Settlement Agreement and Release," which was not referenced in Ford's motion for summary judgment, but in fact was a governing document over the purchase and shut down of Kimnach and was actually negotiated by the parties prior to[10] entry of the asset purchase agreement between Kimnach and Ford's assignee[11] on June 29, 2011[12], the (asset purchase agreement whereby DAC purchased Kimnach to shut it down "Kimnach-DAC APA #2") was actually a part of the settlement papers.

## ARGUMENT

### I.     STANDARD OF REVIEW.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In doing so, the court must "view the evidence in the light most favorable to… the non-movant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Med. Ctr., Inc.*, 290

---

[10] See 5/13/2011 Email from Nanette L. Ferguson sent on behalf of Hunter W. Sims, Jr., Esquire with attached "draft Settlement Agreement and Release, which attaches as an exhibit a new Asset and Real Estate Purchase Agreement between Kimnach Ford, Inc. and Dealership Acquisition Corporation, LLC, which documents we propose to govern the sale of the Kimnach Ford dealership." (DAC_000518-000569), Exhibit HH.

[11] Kimnach-DAC APA #2, dated and signed June 29, 2011, Exhibit KK.

[12] See 7/13/2011 Email exchange between counsel for Kimnach Ford and DAC, which provides that the 5/23/2011 draft was the final version of the Settlement and Release Agreement, so all terms were negotiated and agreed upon between the parties before entry of the Kimnach-DAC APA on June 29, 2011.  (DAC_002525-002534), Exhibit II.

F.3d 639, 645 (4th Cir. 2002); *Anderson*, 477 U.S. at 255. A genuine issue of material fact is created when "a reasonable jury could return a verdict for the non-moving party." *Tyndall v. Dynaric, Inc*., 997 F. Supp. 721, 723 (E.D. Va. 1998). Thus, to obtain summary judgment, defendant "must foreclose the possibility of the existence of facts from which it would be open to a jury to make inferences favorable to" the plaintiff. *Id.*

## II. PRIORITY CLEARLY HAS STANDING TO BRING COUNTS I THROUGH III.

Ford seeks to profit from its wrongdoing of short circuiting Priority's use of Ford's application process by claiming that this prevents Priority from prevailing. Priority's causes of action arises out of Ford's failure to approve Priority as an applicant to purchase the Kimnach dealership and real estate in violation of Va. Code Ann. § 46.2-1569(3a) (2013) and because of tortious interference with Priority's contract and business opportunity. Ford's Motion for Summary Judgment should be denied because: (1) Priority is the party with that contract rights and Ford cannot avail itself to the nonoccurrence it caused; (2) Va. Code Ann. § 46.2-1569(3a) (2013) grants Priority Standing; and (3) Ford's Purported Exercise of Right of First Refusal was invalid because it failed to meet the terms of its own franchise agreement and the requirement to provide the "same or better consideration" pursuant to Va. Code Ann. § 46.2-1569.1(2) (2013) because (a) Ford's initial offer by DAC was distinctly inferior to Priority's agreement leading to a dispute between Kimnach and DAC; (b) the Settlement Agreement and Release which incorporates Kimnach-DAC APA #2 is the result of settling a potential lawsuit and not a result of an exercise of a right of first refusal, and (c) even if the Court views the Settlement Agreement and Release and Kimnach-DAC APA #2 to be a result of Ford's ROFR, it is an invalid exercise of the ROFR because it does not provide Kimnach and Mr. Council with the same terms as

required by Ford's dealer sales and service agreement ("Franchise Agreement")[13] or with the "same or better consideration" as required by Va. Code Ann. § 46.2-1569.1 (2013).

## A.    Priority Is The Party With Contract Rights And Ford Cannot Avail Itself of The Nonperformance Of Things It Caused To Not Occur.

Under Ford's theory, Priority, the party with the contract rights that had not assigned them, was going to assign its contract to Priority Motors Newtown, Inc., at the time of closing, which is customary in these transactions. (See SOFD, Exhibit A, ¶¶ 3, 4).  First, this is a distinction without a difference. For tax purposes, Priority and its subsidiary companies operate as one entity filing a consolidated return.  (See Cummings Deposition, Exhibit K, page 17: 19-23).  Not only do Priority and its subsidiaries file a consolidated tax return, but Dennis Ellmer is the majority owner of Priority and all of its subsidiaries. (See Ellmer Deposition, Exhibit I, page 9: 19-25; 10: 1-5).  So assignment or not, it would have made no difference.

More important, however, while Priority may have intended to assign the contract to an affiliate, it never did so because Ford illegally and tortiously prevented that through its perversion of its own application process and the ROFR process.  In Virginia, a recognized principle is that "he who prevents a thing may not avail himself of the nonperformance which he has occasioned." *See Boggs v. Duncan*, 202 Va. 877, 882, 121 S.E.2d 359 (1961) (holding that "[a] plaintiff cannot prevail in an action for nonperformance of a contract, for which nonperformance he alone is responsible."); *see also Burton v. F.A. Seifert & Co*., 108 Va. 338, 61 S.E. 933 (1908*); United States v. Peck*, 102 U.S. 64 (1880).  *Stockstrom v. Comm'r,* 190 F.2d 283 (1951).[14]  Priority maintained the contract rights.

---

[13] See Kimnach Ford Franchise Agreement, Exhibit R.

[14] The Court held "[t]he applicable principle is fundamental and unquestioned. 'He who prevents a thing from being done may not avail himself of the non-performance which he has himself

Priority was prevented by Ford from availing itself of the full Ford application process and from assigning its rights for closing under the contract to Priority Motors Newtown, Inc. d/b/a Priority Ford. Moreover, Ford's claim that Priority was not an applicant is belied by some critical facts: (1) Ford's right of first refusal was only triggered because Kimnach and Priority had entered into the Kimnach-Priority APA that was submitted to Ford, in furtherance of the application process and making Priority an applicant even though Ford refused to send Priority an application to complete the Ford application process; (2) Ford refers to Priority as the "acquiring dealer,"[15] in internal communications, which it could not be unless it was an applicant; and (3) Priority did file a dealer application with Ford in July 2011, which was received by Ford's regional office located in Chantilly, Virginia,[16] which Ford now claims that it never evaluated or analyzed. (See Lisa O'Connor Vigneault's deposition, Exhibit L, pages 65: 14-20; 174: 3-11, 22; 175: 1-22; 176: 1-22; 177: 1-22; 178: 1-12; 182: 15-22; 183: 1-19; 191: 6-13; 194: 20-22; 195: 1-2. See also April 18, 2011 String of Emails between Lisa O'Connor and Nikki Williams regarding approval process of Dennis Ellmer, (KIM2 1131-1134), Exhibit NN). However, Ford executives identified after reviewing Priority that it was in fact a great dealer

---

occasioned, for the law says to him, in effect: This is your own act, and therefore you are not damnified.'" *Id.* at 288 (quoting *Stearns Co. v. U.S.*, 291 U.S. 54, 61 (1933) (internal citations omitted)). The Court reasoned that "[s]ometimes the resulting disability has been characterized as an estoppel, sometimes as a waiver. The label counts for little. Enough for present purposes that the disability has its roots in a principle more nearly ultimate than either waiver or estoppel, the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong." *Id.* at 288-89 (citing *Imperator Realty Co. v. Tull*, supra. *Stockstrom* was overruled on other grounds by *Auto Club of Mich. V. Comm'r.*, 35 U.S. 180 (1957) (holding that the doctrine of equitable estoppel is not a bar to the correction by the Commissioner of Internal Revenue of a mistake of law).

[15] See Lisa O'Connor Vigneault Deposition, Exhibit L, Page 127:6 -7; See also Email from Keith Bins, (KIM1 00922), Exhibit LL.

[16] See SOFD, Exhibit A, ¶2.   See also Dennis Ellmer's Application, Exhibit E.

9

with a great reputation.  (See *Id).* The one concern that appears to arise from review of Priority

was that it would be too strong of a competitor in the market.  (See *Id.*)

### B.     The Plain Language of Va. Code Ann. § 46.2-1569(3a) (2013) Grants Standing to Priority.

The Supreme Court of Virginia has stated that the "concept of standing concerns itself

with the characteristics of the person or entity who files suit." *Cupp v. Board of Supervisors,* 227

Va. 580, 589, 318 S.E.2d 407, 411 (1984).  Standing requires that the person asserting a position

have a substantial legal right to do so and that the right will be affected by the disposition of the

case.  *See id.* (citing 2 C. Antieau, Modern Constitutional Law § 15:23 (1969)). In determining

whether a person has standing, in essence, the court is determining if the plaintiff "has a

sufficient interest in the subject matter of the case so that the parties will be actual adversaries

and the issues will be fully and faithfully developed." *Id.*[17]

Section 46.2-1569(3a) explicitly grants Priority a right of action because the statute

specifically states that a manufacturer who violates the statute may be sued for damages suffered

as a result of such violation.  *See generally*, *Monroe v. First & Fed., Ltd.,* 69 Va. Cir. 475, 476

(Va. Cir. Ct. 2006) (which held that "[i]ndeed, the statute specifically states that any person who

fails to comply with the statute 'shall be liable for all damages caused by' such failure...' The

court cannot imagine how the legislature could have been clearer in creating a private right to

sue.").

The Virginia General Assembly specifically provided to both the selling dealer and the

buying applicant rights to bring causes of action against a manufacturer in the event it violates

---

[17] As this case is before this Court on diversity jurisdiction, the court's "role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue.'" *BP Prods. N. Am., Inc. v. Stanley*, 669 F.3d 184, 188 (4th Cir. 2012) (quoting *Horace Mann Ins. Co. v. General Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008)).

Section 46.2-1569(3a).   If the selling dealer does not bring a cause of action against a manufacturer, the proposed buyer may file a legal action:

> In the event the manufacturer, factory branch, distributor or distributor branch takes action to prevent or refuse to approve the sale or transfer of the ownership of a dealership by the sale of the business, stock transfer, or otherwise, or the transfer, sale or assignment of a dealer franchise, or a change in the executive management or principal operator of the dealership, without a statement of specific grounds for doing so that is consistent with subdivision 3 hereof or imposes a condition in violation of subdivision 3a hereof, that shall constitute a violation of this section. The existing dealer may request review of the action or imposition of the condition in a hearing by the Commissioner. If the existing dealer does not request a hearing by the Commissioner concerning the action or the condition imposed by the manufacturer, factory branch, distributor, or distributor branch, and the action or condition was the proximate cause of the failure of the contract for the sale or transfer of ownership of the dealership, the applicant for approval of the sale or transfer or the existing dealer, or both, may commence an action at law for violation of this section. The action may be commenced in the circuit court of the city or county in which the dealer is located, or in any other circuit court with permissible venue, within two years following the action or the imposition of the condition by the manufacturer, factory branch, distributor, or distributor branch for the damages suffered by the applicant or the dealer as a result of the violation of this section by the manufacturer, factory branch, distributor, or distributor branch, plus the applicant's or dealer's reasonable attorney fees and costs of litigation...

*Id*. (emphasis added).

Priority was an applicant for approval of the sale of Kimnach, within the meaning of Section 46.2-1569(3a) since the context of the statute itself makes clear that the applicant is the party to the contract that is the proposed buyer.  If that is not enough, the contract itself was submitted to Ford, in furtherance of the process for application. (See Submission Letter, Exhibit M).  Moreover, the very fact that Ford characterized its actions as an exercise of the ROFR estops it from challenging Priority's position as applicant for approval of the sale. Pursuant to

Section 46.2-1569.1, a manufacturer can only exercise a right of first refusal (which Ford claims that it did) when a sale is conditioned on entering into a dealer agreement with "the proposed new owner or transferee", i.e. the applicant, which in this case is Priority. (See SOFD, Exhibit A, ¶¶ 2, 3).

The Virginia Motor Vehicle Franchise law restricts the manner and grounds upon which a manufacturer may properly reject a dealer applicant for the sale or transfer of a dealership. Faced with prospect of Priority becoming a franchisee through closing on the Kimnach-Priority APA, Ford had only two choices under Virginia law.

First, it could reject Priority as an applicant based on established standards pursuant to Virginia law which it could not do because it could not meet the requirements of the applicable statute.[18] Ford admittedly did not provide any statement that meets the specific grounds stated in Section 46.2-1569(3) because "Priority was not approved by Ford because Ford elected to exercise its contractual right of first refusal." (See Answer, ¶19, Dkt. #3).

Moreover, Ford admits that it sent Priority a letter on November 2, 2010 in which Ford stated that it "has high regard for you [Priority] as a dealer candidate and we would like very much to find another opportunity for you to become a Ford dealer."   (See Complaint, ¶22;

---

[18] Section 46.2-1569(3), states in pertinent part that:

> …it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives: (3)No such objection shall be sufficient unless the failure to approve is reasonable…, the only grounds that may be considered reasonable for a failure to approve are that an individual who is the applicant or is in control of an entity that is an applicant (i) lacks good moral character, (ii) lacks reasonable motor vehicle dealership management experience and qualifications, (iii) lacks financial ability to be the dealer, or (iv) fails to meet the standards otherwise established by this title to be a dealer.

Va. Code Ann. § 46.2-1569(3) (2013) (emphasis added).

12

Answer ¶22, Dkt. #3. See also November 2, 2010 Letter, Exhibit P).   Ford's only other

alternative was to properly exercise its right of first refusal. It did not do that either.

   **C.    Ford's Purported Exercise of Right of First Refusal was invalid because it failed to meet its Franchise Agreement requirements or the "same or better consideration" requirements pursuant to Va. Code Ann. § 46.2-1569.1(2) (2013).**

   Section 46.2-1569.1 regulating the right of first refusal of a motor vehicle manufacturer is

very specific.[19] Ford's Sales and Service Agreement ("Franchise Agreement") is similar in that

---

[19]

   Notwithstanding the terms of any franchise agreement, in the event of a proposed sale or transfer of a dealership, the manufacturer or distributor shall be permitted to exercise a right of first refusal to acquire the new vehicle dealer's assets or ownership, if such sale or transfer is conditioned upon the manufacturer's or dealer's entering into a dealer agreement with the proposed new owner or transferee, only if all the following requirements are met:
   1. To exercise its right of first refusal, the manufacturer or distributor must notify the dealer in writing within 45 days of its receipt of the completed proposal for the proposed sale or transfer;
   2. The exercise of the right of first refusal will result in the dealer's and dealer's owner's receiving the same or greater consideration as they have contracted to receive in connection with the proposed change of ownership or transfer;
   3. The proposed sale or transfer of the dealership's assets does not involve the transfer or sale to a member or members of the family of one or more dealer owners, or to a qualified manager or a partnership, limited liability company, corporation, or other entity controlled by such persons; and
   4. The manufacturer or distributor agrees to pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owner and transferee prior to the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the proposed sale or transfer of the dealership or dealership assets. Notwithstanding the foregoing, no payment of such expenses and attorney's fees shall be required if the dealer has not submitted or caused to be submitted an accounting of those expenses within 30 days of the dealer's receipt of the manufacturer's or distributor's written request for such an accounting. Such accounting may be

it requires that Ford "shall have a Right of First Refusal to purchase the stock or assets <u>on the</u> <u>same terms and conditions</u> offered or agreed to with such person, regardless of whether the proposed buyer is qualified to be a dealer." (emphasis added).[20]  Pursuant to Virginia law, Ford could properly exercise the ROFR "only if…the exercise of the right of first refusal will result in the dealer's and dealer's owner's receiving <u>the same or greater consideration</u> as they have contracted to received in connection with the proposed change of ownership or transfer." Va. Code Ann. § 46.2-1569.1(2) (2013).  (emphasis added).

When construing language similar to "same terms and conditions" or "same or greater consideration" in other contracts, courts have insisted that purchasers comply with price and non-price conditions. Where the contractual right of first refusal requires that Ford match all of the "terms and conditions" of Priority's bona fide offer, Ford is required to do just that – exactly match all the triggering offer's terms and conditions, and not only its price terms.  See *Smith v. Hevro Realty Corp.*, 507 A.2 980, 985 (Conn. 1986)[21] (*Smith* court held that the holder's failure to pay earnest money when it purported to exercise the right of first refusal as required by the triggering offer was not a proper acceptance).  In fact, "'[w]ithout an exact matching requirement, the right of first refusal is an impediment to the marketability of property, because it gives the holder of the right a practical power to impede a sale to a third party by refusing to match the third party's offer exactly and then arguing that the discrepancy was immaterial.'"

---

requested by a manufacturer or distributor before exercising its right of first refusal.

Va. Code Ann. § 46.2-1569.1 (2013).

[20] See Sales and Service Agreement, §24(b)(1), Exhibit R.

[21] Cited in *Alga v. Vega & Assoc.*, 17 Va. Cir. 260 (1989).

*David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 457, 914 A.2d 136, 144 (2007) (quoting *Miller v. LeSea Broad, Inc*., 87 F.3d 224, 226 (7th Cir. 1996)).

In this case, Ford recognized these obligations since Ford's assignee DAC claimed it "unconditionally exercised its right of first refusal assigned from Ford to purchase Kimnach Ford Incorporated on October 19 and is prepared to proceed on those terms." (See October 20, 2010 at 3:16:07 pm Email from Nikki Williams to Christina Floyd, (DAC_003051-003053), Exhibit Z). Ford's assignee, DAC, knew that they

> were supposed to, you know, be the assignee of Ford's right of first refusal, and [they] were supposed to acquire the assets of Kimnach Ford and made the offer to Mr. Council the same or better as they were under the Priority-Kimnach Asset Purchase Agreement.

(See Barton Deposition, Exhibit V, page 20: 5-19. See also Lisa O'Connor Vigneault Deposition, Exhibit L, page 272: 3-5). However, when DAC exercised that right assigned from Ford, Ford's assignee did something much different. Under the Kimnach-DAC APA#1 it refused to provide Mr. Council with a same or greater offer than what he would have received from the Priority-Kimnach APA.

Mr. Council did not want DAC to buy his dealership because DAC was formed for the purpose of closing it down and would not operate a Ford Dealership. (See Council Deposition, Exhibit C, page 200: 19-25; 201: 1-2.) Ford's purported exercise of the right of first refusal resulted in the tender to Kimnach of the October 19, 2010 Kimnach-DAC APA #1 which resulted in Mr. Council receiving (a) a 10% interest in DAC, which was a non-operating organization that would have no assets and would not operate a Ford Dealership[22], (b) a

---

[22] See Kimnach-DAC APA #1, §9.3.1 "Buyer shall have issued the 10% membership interest in Buyer to Council subject to Council's execution of an Operating Agreement (in the form attached as Exhibit B) upon full compliance by Council with the Subscription Agreement (in the

guaranteed consulting agreement with a non-operating entity[23], (c) no health insurance because the non-operating entity[24] (DAC) would not have such benefits that he was guaranteed in the consulting agreement[25], (d) no vehicles that were provided under the Kimnach-Priority APA because the non-operating entity would not have such assets, and (e) the three key Kimnach employees guaranteed employment by Priority would be employed by a non-operating entity that had no assets.

Ford knew when it exercised its ROFR it would be inferior to that contracted by Priority because its goal was to close the dealership and offer Mr. Council nothing for the subscription agreement on the argument that "if no business exists – no payment." (See SOFD, Exhibit A, ¶¶ 37, 38. See also Lisa O'Connor Vigneault Deposition, Exhibit L, page 63: 16-18). The term "no payment" means "that there would be no compensation for the subscription agreement." (See Lisa O'Connor Vigneault Deposition, Exhibit L, page 66: 18-21).

---

form attached as Exhibit C), page 20, (KIM1 01037), Exhibit Y.  See also, Barton Deposition Exhibit V, page 23:16-21:

> Q:   On or about the time that DAC was formed, was there any intent to operate the dealership on an ongoing basis in the future? I'm talking about Kimnach.

> A.   When DAC was formed, the intent was not to operate it on an ongoing basis.

See also Lisa O'Connor Vigneault Deposition, Exhibit L, page 229: 22; 230: 1-15.

[23] See Kimnach-DAC APA #1, §9.3.2 "Buyer shall have executed and Council shall have executed the Consulting Agreement (Exhibit D).  The obligation of SELLER to go to Closing hereunder is specifically condition on the guaranty by Buyer, Beach Ford, Inc., Greenbrier Ford, Inc. and Freedom Ford, Inc. of the obligations owed to Council in the Consulting Agreement," page 20, (KIM1 01037), Exhibit Y.

[24] See October 26, 2010 letter from Mr. Council's counsel, (KIM2 3740-3744), Exhibit AA.

[25] See *Id*.

The issue of whether Ford performed the ROFR as required is one of fact for the jury. But there can be little contest that Ford's purported exercise of a ROFR does not meet the requirements of its Franchise Agreement or those of section 46.2-1569.1 because the exercise neither resulted in, nor could it have resulted in, the same or greater consideration provided in the Kimnach-Priority APA. Ford assigned the ROFR rights to DAC to close Kimnach. A closed dealership could not provide Council's bargained for equity interest in a company that would own and operate the Ford dealership and an employment opportunity for Council and other Kimnach employees.

The issue of whether the Kimnach-DAC APA #2 was even the result of the exercise of the ROFR is one for the jury. The agreement ultimately entered by which DAC purchased Kimnach was nothing more than settlement of a disputed claim. Once Ford made clear its intent to not perform the contract it assumed by purportedly exercising the ROFR, it ended those contract rights.

> Where an acceptance varies from the original offer, the property owners stands to lose his bargain…(citations omitted)…Even if a purported acceptance which leaves the property owners "as well off" as a third party offer, but which modifies, adds to or otherwise qualifies the terms of the offer, generally constitutes a rejection of the option and a counter-offer….(citations omitted)…The property owner remains free to accept this counter-offer or to sell the property to the third party, but the preemptive right lapses because the rightholder has failed to make a valid acceptance.

See *West Texas Transmission, L.P. v. Enron Corp*., 907 F.2d 1554, 1565 (5th Cir. 1990).

By Ford's and DAC own acts, the Kimnach-Priority APA was of no further force and effect and Ford's assignee felt the need to tender a substitute quickly (Kimnach-DAC APA #1), and the ultimate purchase was undertaken pursuant to yet another version (Kimnach-DAC APA #2). DAC's first acquisition agreement, the unexecuted Kimnach-DAC APA #1, led to a dispute

between Kimnach and Ford, including threats of legal action and a draft lawsuit (See Exhibit U). Mr. Council felt threatened when he received this letter and lawsuit, and that letter had a major impact on Kimnach's settlement with DAC. (See Mr. Council's Deposition, Exhibit C, pages 208: 8-14, 209: 21-25). That settlement was reflected in the settlement papers that contained Kimnach-DAC APA #2, the subsequent asset purchase agreement that had to be entered because of the termination of rights under the Kimnach-Priority APA. (See Exhibit KK. See also SOFD, Exhibit A ¶¶ 54, 55, 56).

Finally, there is an issue of fact as to whether the ultimate purchase of Kimnach provided the same or better consideration than that provided in the Priority-Kimnach agreement, even if that is viewed as the result of the exercise of the ROFR. The reason Mr. Council approached Dennis Ellmer in 2010 to sell Kimnach Ford is not to close the dealership, but to actually be part of the dealer franchise and make his dealership the hub for Ford vehicle sales on Military Highway. (See Council Deposition, Exhibit C, page 38: 13-21; 177: 7-12). Despite Ford's claim that DAC's ultimate purchase was the same or better, Mr. Council disagrees. (See Council Deposition, Exhibit C, page 47: 11-25; 48: 1-25; 49: 1-25; 50: 1-2). And this disagreement is well-founded. Even if one assumes, for purposes of argument, that the agreement ultimately reached as settlement of the dispute between the parties could be considered the exercise of the ROFR, it still does not match what Mr. Council would have received had he gotten the benefit of the Priority deal. Looking just at the financial aspects of the Kimnach-Priority APA, Council was entitled to guaranteed compensation of $1,680,000 under his Consulting Agreement, with a continuing opportunity to consult after that. (See Kimnach-Priority APA, Exhibit H. See also Council Deposition, Exhibit C, pages 177: 7-14; 184: 12-25). Kimnach's appraiser valued

Council's 10% equity interest in Priority Ford at $1,581,000[26], which combined with the guaranteed consulting compensation of $1,680,000 totaled $3,261,000, exceeding Ford's purported ultimate payment of $3,187,550. (See Kimnach-DAC APA #2, Exhibit KK.  See also Ford-DAC Draft Complaint, Exhibit U).

To counter this problem, Ford contends that one must consider the tax effects of the deal represented by Kimnach-DAC APA#2. However, one does not need to improperly apply a "tax effect", since Priority's evidence will show that the deal it had with Kimnach dwarfed the Kimnach-DAC APA #2 deal. Based on report of the expert who will be called by Priority, Priority Ford would have minimum profits of $26,256,826 in just 15 years of ownership, as well as a minimum total of $3,912,038 for the present value or goodwill of the dealership. (See Ken Rosenfield's Expert Report, January 4, 2013, Exhibit O). Mr. Council's 10% equity interest in Priority Ford would have yielded him a minimum value of $3,016,886.  He also would have been paid his $1,680,000 for a consulting fee for a total of $4,696,886 for just these elements of the deal, exceeding the payment under Kimnach-DAC APA #2 by more than $1.5 million. In addition, Mr. Council would have had a 10% interest in the book value of Priority Ford[27], plus any payments for consulting work after the guaranteed period[28], and use of vehicles[29]. This is far more than the proceeds of the DAC deal, tax effect or not. And, not incidentally, Priority's deal

---

[26] See April 14, 2011 Letter from Hunter Sims, Esquire, (KIM1 00793-00794), Exhibit FF.

[27] See Council Deposition, Exhibit C, page 185: 21-22.

[28] See Council Deposition, Exhibit C, page 184: 13-25; 185: 1-8

[29] See Council Deposition, Exhibit C, page 168: 14-25; 169: 1-9

provided what Mr. Council really wanted – continued participation in a successful, ongoing business that his family had started more than fifty years before[30].

**D.    Priority Has Standing for Claims of Tortious Interference (Counts II and III).**

Ford contends that Priority does not have standing to pursue claims of tortious interference because it is a party to its own franchise agreement and that the threshold question is whether Ford is a party to its franchise agreement, thus incapable of tortiously interfering with that agreement. (See Dkt #30, page 26).   However, Ford distorts Priority's tortious interference claims and fails to acknowledge that Priority's tortious interference claims are a result of Ford's tortious interference with the Kimnach-Priority APA, to which Ford is not a party.   The contract between Kimnach and Priority included the sale of real estate along with other tangible property that Ford did not own or have any claim or right to assert.   Ford utilized improper means and methods with an ulterior motive to interfere with the contractual rights of Priority.

In Virginia, in order to state a valid claim for tortious inference with a contract, the plaintiff must prove the following elements: 1) the existence of a valid contractual relationship or business expectancy; 2) knowledge of the relationship or expectancy on the part of the interferer; 3) intentional interference inducing or causing a breach or termination of the contractual relationship or expectancy; and 4) resultant damages to the party whose relationship or expectancy has been disrupted.   *See Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (Va. 1985).   Similarly, in order to state a valid claim for tortious interference with a business expectancy, a plaintiff must establish the following elements: 1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; 2)

---

[30] See Lisa O'Connor Vigneault Deposition, Exhibit L, page 218: 18-21.   See also Cummings Deposition, Exhibit J, page 42: 6-25.   See also Council Deposition, Exhibit C, page 178: 202-23.

defendant's knowledge of the relationship or expectancy; 3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and 4) damage to plaintiff.  *See Glass v. Glass*, 228 Va. 39, 51-52, 321 S.E.2d 69, 77 (1984).

Priority has standing for tortious interference in Counts II and III because Priority has established all the requisite elements of its claims.  First, the Kimnach-Priority APA created a valid contractual relationship and business expectancy between Priority and Kimnach, along with the probability of future economic benefit to Priority.  Next, Ford knew of the Kimnach-Priority APA and the business expectancy between Priority and Kimnach under the Kimnach-Priority APA's terms and conditions. Third, Ford intentionally interfered and caused the termination of the Kimnach-Priority APA through the use of improper methods by violating Va. Code Ann. §§ 46.2-1569 and 1569.1 through its unreasonable refusal to approve Priority's application and wrongful exercise of an invalid ROFR to terminate the dealership. Absent Ford's improper turn-down and improper exercise of its ROFR, Priority would have successfully settled on the Kimnach-Priority APA. Finally, Ford's improper refusal to approve Priority as a buyer and its invalid ROFR resulted in damages to Priority by disrupting its contractual relationship and business expectancy with Kimnach and preventing Priority from realizing the benefits from the Kimnach-Priority APA.

Ford contends that it could not tortiously interfere since its approval of the Kimnach-Priority APA was a condition of the transaction. But when Ford's use of its approval mechanism is wrongful, a cause of action for tortious interference may be maintained. In Virginia, a plaintiff may maintain an action for intentional interference with a contractual expectancy by alleging that the defendant employed "improper methods."  *See Duggin v. Adams,* 234 Va. 221, 226-27, 360

S.E.2d 832, 836 (1987). In Virginia, methods considered "improper" include those that are "illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* (citing *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982)).  Furthermore, the Virginia Supreme Court has stated that "'tortious interference' means only that the interference was intentional and improper under the circumstances, not that the 'improper methods' used were inherently illegal or tortious." *Wachovia Bank, N.A. v. Ranson Tyler Chevrolet, L.L.C. et al.,* 73 Va. Cir. 143, 151 (Va. Cir. Ct. 2007) (quoting *Maximum, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414, 493 S.E.2d 375, 378 (1997) (finding that plaintiff's allegation of defendant's defamatory statements was sufficient to state a cause of action for tortious interference with a contractual expectancy, even though the defendant may have had a qualified privilege to make such statements)).

For the same reasons that a jury can find that Ford violated the Virginia Code, it can find that Ford tortiously interfered with Priority's contract and business expectancy. For a proper exercise of the ROFR, Ford was required to assure that DAC would comply with the Kimnach-Priority APA.  It did not.

In its Motion for Summary Judgment, Ford contends that "the threshold question is whether Ford is a party to its franchise agreement and, thus, incapable of tortuously interfering with those agreements. Courts nationwide have held that franchisors are parties to, and are incapable of tortuously interfering with, their franchise agreements." (Dkt. #30, page 26).  To support its argument, Ford cites to one Virginia federal district court case, *McDonald's Corp. v. Turner-James*, No. 05-804, 2005 U.S. Dist. LEXIS 42755, at *14-15 (E.D. Va. Nov. 29, 2005), to support its proposition that "a franchisor cannot tortiously interfere with its franchise agreement." (Dkt. #30 at 26-27). Notably, this case concerns a restaurant franchise, not a car

22

dealer franchise which is governed by Va. Code Ann. § 46.2-1569.  Furthermore, this case was

decided in 2005, two years before the Virginia legislature amended Va. Code § 46.2-1569 to

include subsection (3a) expressly granting prospective dealership buyers the standing to sue

manufacturers for wrongful turn-downs of dealership sales.  Moreover, since the McDonald's

decision, this Court has held that it knows of no cases in Virginia that have infused West

Virginia law in the manner in which the *McDonald's* court mentioned in Dicta.

> Defendants cite *McDonald's Corp*., 2005 U.S. Dist. LEXIS 42755,
> at *14, and *Childers Oil Co., Inc. v. Exxon Corp*., 960 F.2d 1265,
> 1271 (4th Cir. 1992), for the proposition that "tortious interference
> claims lie only against a party that is a stranger to the relationship.
> Doc. 14 at 16. However, the opinion in *Childers Oil* construes a
> tortious interference claim based on the law of West Virginia,
> citing an opinion from the Supreme Court of Appeals of West
> Virginia, *Torbett v. Wheeling Dollar Sav. & Trust Co*., 173 W. Va.
> 210, 217, 314 S.E.2d 166, 173 (1983). While the United States
> District Court in Alexandria applies the statement of law in
> *Childers Oil* broadly to a case involving Virginia law, the Court is
> aware of no other similar precedent infusing the Virginia law of
> tortious interference with West Virginia requirements. *McDonald's
> Corp*., 2005 U.S. Dist LEXIS 42755, at *14-15. To the contrary,
> other precedents concerning Virginia law indicate a cause of action
> for tortious interference is proper against "a competitor seeking an
> ad- vantage, but not against "a party to the relationship acting in its
> own economic interests to limit liability. *DRC, Inc. v. Custer
> Battles, LLC*, No. 06-1591, 234 Fed. Appx. 38, 2007 U.S. App.
> LEXIS 11518, at *14 (4th Cir. May 16, 2007) (unpublished)
> (citing *Zoby v. American Fid. Co*., 242 F.2d 76, 80 (4th Cir. 1957)
> (stating a tortious interference claim involves "a competitor seek-
> ing his own advantage by causing the breach of another's
> contract)). Accordingly, under the governing Virginia law opinions
> of the Fourth Circuit, a tortious interference claim is properly
> asserted against a "competitor seeking his own advantage by
> causing the breach of another's contract or expectancy. *Zoby*, 242
> F.2d at 80; DRC, 2007 U.S. App. LEXIS 11518, at *14.

See *Rescue Phone, Inc. v. Enforcement Tech. Group, Inc*., No. 2:07cv58, 2007 U.S. Dist. LEXIS

49401 (E.D. Va. July 9, 2007).

The *McDonald's* case is distinguishable from the facts of the instant case.  It did not turn on an equivalent statute to the one at issue in this case, Section 46.2-1569, that established limits on the franchisor's consideration of an application of a potential franchise. In the instant case, Ford had no right to unreasonably turn down the Kimnach-Priority APA without grounds for refusal as required under Section 46.2-1569(3). The one purported basis, the exercise of its ROFR, was invalid and thus did not constitute a valid condition on the approval of the Kimnach-Priority APA under subsection (3a) of the statute.

The case of *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358 (3d Cir. 1992) is significantly more analogous to the instant case. In *Big Apple*, plaintiff applicants sought to purchase the assets of a BMW dealership from a dealership owner who was about to lose her lease.  *Big Apple*, 974 F.2d at 1361. The dealership owner and plaintiff applicants negotiated and reached an agreement for a price of $800,000 plus an undetermined amount for parts.  *Id.*  The BMW franchisor subsequently informed the dealership owner that it would not award a franchise to the plaintiff applicants, and only days before the expiration of the owner's lease, it offered her the significantly lower purchase price of $50,000, plus a repurchase of parts as required by the franchise agreement.  *Id.*  The owner accepted this BMW offer, and the franchisor closed the dealership.  *Id.*  The court considered Sections 766[31] and 766B[32] of the Restatement (Second) of Torts in determining whether the franchisor's conduct was "improper."  *Big Apple*, 974 F.2d at 1381. It stated that under the Restatement, "the issue in each case is whether the interference is improper or not under the circumstances" and that "a determination of propriety requires inquiry into the 'mental and moral character of the defendant's conduct.'"  *Id.*  The court found that

---

[31] Recognized in *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 708 S.E.2d 867 (2011).

[32] Recognized in *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268 (4th Cir. 1980).

exercise of a right of first refusal in violation of law could constitute tortious interference. The *Big Apple* case involved violation of the anti-trust laws and the court found that "conduct … that is in restraint of trade" may constitute "unprivileged, improper interference," such as the "[e]conomic pressure" that allegedly applied to the dealership owner when the franchisor bought the dealership at a significantly lower price than plaintiff applicants had offered "while suggesting that [the owner] had nothing to sell without its approval." *Id.* at 1382.

The facts in *Big Apple* are strikingly similar to the facts in this case. Like the plaintiff applicants in *Big Apple* who negotiated a deal with the dealership owner for the purchase of dealership assets, Priority came to an agreement with Kimnach and Council for the purchase of the Kimnach dealership. Similar to the franchisor that refused the applicants and pressured the owner to accept its lower offer for purchase of the assets in order to close the dealership, Ford in this case also improperly refused Priority's application and re-negotiated with Kimnach and Council for less consideration in order to terminate the Dealership. As in the instant case, the asset purchase agreement was contingent on the franchisor's approval of the plaintiff's application. The court's holding demonstrates that the franchisor's right of approval did not preclude it from facing claims of tortious inference with the asset purchase agreement.

*Bowser Cadillac, LLC v. GMC*, No. 07-1149, 2008 U.S. Dist. LEXIS 4206 (W.D. Pa. Jan. 18, 2008) is similar. In *Bowser*, the franchisor turned down the applicant to purchase a dealership because it exercised its contractual right of first refusal. *Bowser* contended that the purported exercise was untimely and wrongful. Because of those allegations, the court ruled on a

motion to dismiss that counts alleging tortious interference could proceed since improper actions violating a state statute can be the basis for a tortious interference claim.[33]

Ford argues that this case is similar to the *Rosado v. Ford Motor Company*, 337 F.3d 291 (2003) as grounds for judgment.  See (Dkt #30).  However, the *Rosado* case is not persuasive or analogous to the case before this court because: (1) it was decided on a statute (63 P.S. 818.12) that is not comparable to Va. Code §46.2-1569[34] because 63 P.S. 818.12 does not provide a prospective purchaser the right to sue a manufacturer like the right provided in Section 46.2-1569; (2) *Rosado* did not overturn *Big Apple* and the *Bowser* decision was rendered five years after *Rosado*, both of which (*Big Apple* and *Bowser*) are more analogous to this case; and (3) the Virginia Legislature must be presumed to have been aware of the basis of the *Rosado* case, which was decided in 2003, when the General Assembly amended Section 46.2-1569 in 2007 to provide prospective dealers with the right to sue manufacturers for improper turndowns and to specifically prevent cases from being decided in Virginia as *Rosado* was.

Like the courts' findings in *Big Apple* and *Bowser* that conduct violating a statute may constitute intentional improper interference with contract and prospective contractual advantage, Ford's conduct in this case also constitutes tortious interference with the Kimnach-Priority APA and Priority's expectations.  As such, Ford's arguments that it "cannot tortiously interfere with its own contract" is invalid, and Priority's tortious interference claims should proceed.

---

[33] The apparent majority of states, in the context of franchise agreements, treat franchisee's claims of tortious interference against their franchisors like "any other claim against an intervenor in the franchisee's relationship with its customers."  *Carvel Corp. v. Noonan*, 350 F.3d 6, 15 (2nd Cir. 2003).  These courts thus do not exclude franchisors from tort liability simply by the fact that they are a party to their own franchise contracts.  *Id.* at 16-17 (holding that if a franchisor violates a duty "independent" of its contract such as the "duty to not interfere with a franchisee's prospective contractual relations," it may be liable in tort.)

[34] Virginia appears to be the only state that actually provides statutory grounds for a prospective buyer to sue the franchisor for improper turndown.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff Priority Auto Group, Inc. respectfully requests that this Honorable Court deny Defendant Ford's Motion for Summary Judgment under Rule 56 because there are genuine issues of material fact that must be decided at trial of this case.

Respectfully submitted,


_____/s/_____
Brad D. Weiss (VSB 22389)
Michael G. Charapp (VSB 14329)
Charapp & Weiss, LLP
8180 Greensboro Drive, Suite 1000
McLean, Virginia 22102
(703) 564-0220 (office)
(703) 564-0221 (facsimile)
brad.weiss@cwattorneys.com
mike.charapp@cwattorneys.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this 22nd day of March 2012, a copy of the foregoing was served via the Court's ECF system to the following:

Richard J. Cromwell, Esq.
Kenneth W. Abrams, Esq.
McGuire Woods, LLP
101 W. Main Street, Suite 9000
Norfolk, Virginia 23510
(757) 640-3775 (office)
(757) 640-3955 (facsimile)
rcromwell@mcguirewoods.com
kabrams@mcguirewoods.com

Tracy J. Walker, IV, Esq.
McGuire Woods, LLP
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1131 (office)
(804) 698-2201 (facsimile)
twalker@mcguirewoods.com

Kurt D. Williams, Esq. (pro hac vice)
Stephen M. Bledsoe, Esq. (pro hac vice forthcoming)
Berkowitz Oliver, LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
(816) 561-7007 (office)
(816) 561-1888 (facsimile)
kwilliams@berkowitzoliver.com

*Counsel for Defendant*

_____/s/_____
Brad D. Weiss (VSB 22389)
Michael G. Charapp (VSB 14329)